DECISION
Before this Court are appeals by petitioners David Barnes Development, Inc. et al (the petitioners) from two decisions of the Zoning Board of Review for the Town of South Kingstown (the Board). In WC 95-0053, petitioners seek a reversal of the Board's January 10, 1995 decision upholding town building inspector Russell Brown's finding that the petitioners' patio canopy and heated enclosed patio is, as constructed, in violation of the 1994 special use permit which authorized the mere installation of an awning over the outside patio. In WC 95-0270, petitioners seek a reversal of the Board's May 1, 1995 decision denying petitioners' request for a curative special use permit so that the canopy enclosure as constructed would be in compliance with the zoning laws. Jurisdiction lies pursuant to R.I. Gen. Laws § 45-24-69.
Facts
The petitioners are the owners of the Mews Tavern located at 456 Main Street, South Kingstown Rhode Island as shown on South Kingstown Assessor's Map 56-3, lot 20 (the property). In 1991 petitioners were granted a special use permit to construct a patio on the property in front of the Mews, to increase seating capacity, and to maximize business during the summer months. When construction was completed, this open air patio was bordered by railroad tie planters and lattice woodwork of an undisclosed height. It was not enclosed nor did it have a roof of any kind.
In 1994, petitioners sought a second special use permit to cover the outdoor patio with an awning, to build a 20' x 20' storage area, and extend its patio hours of operation from 11:00 p.m. to 1:00 am. On May 10, 1994, the Board issued a Notice of Decision which granted petitioners a special use permit allowing for installation of an awning over the patio, construction of a storage area, and extension of the patio hours of operation for a one-year trial period. The Notice of Decision stated:
 "your petition for a Special Exception to install an awning over the outside patio, to be relieved of the 11 PM limit of the outside use and to construct a 20' x 20' storage area was granted [in] accordance with the following stipulations: the canopy be constructed as per Exhibit No. 4, gutters be installed on the canopy and that food service until 1 a.m. on the patio will be for a trial period of one year."
See, Notice of Decision dated May 10, 1994 and Exhibit 4 attached thereto. Exhibit 4 is a drawing of the proposed awning submitted by petitioners' designers "Sign Awning" of Pawtucket. It shows the proposed height, width and length of the canopy. It also shows where corner supports were to be constructed and provides for one doorway entrance. Exhibit 4 does not show any discernible wall structure, windows, heating ducts, furnaces, or internal supports other then the support beams in the corners and centers of side each panel. The provision for a door indicates some sort of limited side structure sufficient to support a door and doorway.
Shortly after reviewing the May 10, 1994 Notice of Decision, petitioners built the first of two canopies. According to petitioners, this canopy, which consisted of a large purple tent supported by a simple metal frame, was defective in that it leaked and was "unsightly". No one ever alleged that this canopy was in violation of the May 10, 1994 Notice of Decision and it appears to have been in compliance with Exhibit 4 attached thereto. When the summer temperatures dropped, so did the Mews patio business. In late August 1994, therefore, petitioners developed a plan to install side curtains on the patio. Petitioners changed this plan, however, when they discovered that for the same price as side curtains, they could install temporary windows into a more extensive wooden frame which would span the areas between the pieces of the existing canopy's simple metal frame. Petitioners proceeded with that construction and they also installed a gas-powered hot air heating system on the patio together with the associated duct work.
In early November 1994, Town Building Inspector Russell Brown issued petitioners a Notice of Violation alleging that the newly installed walls, windows, and heating system were not authorized by the 1994 special use permit. Petitioners appealed the issuance of the violation and alternatively sought the issuance of a new curative special use permit that would bring the already constructed structure into compliance with the zoning ordinance.
After holding a hearing on December 21, 1994, the Board, in two separate opinions, denied petitioners' requests.
Standard of Review
This Court's review of a zoning board decision is controlled by R.I. Gen. Laws § 45-24-69 (D), which provides:
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board or review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing a decision of a zoning board, a justice of the Superior Court may not substitute his or her judgment for that of the zoning board if he or she conscientiously finds that the board's decision was supported by substantial evidence. Apostolouv. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a mere scintilla but less than a preponderance." Caswell v. GeorgeSherman Sand and Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981) (citing Apostolou, 120 R.I. at 507, 388 A.2d 824-825). Rather the reviewing court simply "examines the record below to determine whether competent evidence exists to support the tribunal's findings." New England Naturist Ass'n, Inc. v. George,648 A.2d 370, 371 (R.I. 1994) citing Town of Narragansett v. InternationalAssociation of Fire Fighters, AFL-CIO, Local 1589, 119 R.I. 506,380 A.2d 521 (1977). If the record is "completely bereft of competent evidentiary support" for a board's findings then the decision must be reversed. Sartor v. Coastal Resources ManagementCouncil, 542 A.2d 1077 (RI 1988). Additionally, it is not within this Court's authority to uphold a zoning board's decision which is infected by error of law. Harmel Corp. v. Zoning Board of
Review, 603 A.2d 303 (R.I. 1992).
The Board's Decision
On appeal, in WC 95-0053, petitioners attack the Board's denial of its appeal from the Building Inspector's Notice of Violation. Petitioners argue that the Board's decision is clearly erroneous as it is not supported by the competent evidence of record. They argue that the special use permit granted by the Board in 1994 did not prohibit the installation of windows, walls and heat, and that under R.I. Gen. Law § 45-24-61 (a) such explicit prohibitions would have had to have been incorporated into the permit to later serve a the basis for a violation.
R.I. Gen. Law § 45-24-61 (a) provides that the zoning board of review "shall include in its decision all findings of fact and conditions". It is this Court's ruling that the Board's decision affirming the Building Inspector's Notice of Violation is properly supported by competent record evidence and is in compliance with § 45-24-61 (a). During the December 21, 1994 hearing, the Board had before it the special use permit that it had issued the petitioners on May 10, 1994. That permit allowed only for the installation of an awning in conformance with Exhibit 4 as designed and proposed by petitioners. Exhibit 4, as the Board correctly found, shows a temporary canopy structure, without walls, wooden framing, windows, duct work or a heating system. It depicts a simple tent-like canopy structure, supported only by corner and center beams which are enclosed by soft side panels. See Notice of Decision dated January 10, 1995 ¶ 3-4;Notice of Decision dated May 10, 1994; Exhibit # 4 attached thereto; and Tr. Notice of Violation Hearing at 11-12. During his testimony before the Board, Barnes admitted that he did not remember any discussion of windows and doors at the May 1994 special permit hearing because he "told them that [he] was going to have side curtains and screens and doors." Tr. Notice ofViolation Hearing at 12. Petitioners clearly understood the nature of the awning they were allowed to build, as evidenced by the first canopy they installed in conformance with the permit and Exhibit 4 attached thereto. The Town suggests, and the petitioners do not dispute, that the parties stipulated prior to issuance of the May 10, 1994 special use permit, as reflected in the permit and Exhibit 4 attached thereto, and as reflected in the minutes of the May 10, 1994 meeting (although not in the language of the Notice of Decision), that "the permit is for a canopy and not a permanent addition, i.e., no windows, heat, walls, etc. but the frame will be allowed to remain year round." See Exhibit 5; Item 7; and the parties memoranda in support of and in opposition to the appeals.
The Board also had before it undisputed evidence that the second canopy structure actually built by petitioners, ostensibly pursuant to the special use permit, contained a wooden frame which supported walls, windows and a heating system. Tr. Noticeof Violation Hearing at 8 13. South Kingstown Building Inspector Russell Brown testified at the hearing before the Board that, after inspecting the premises, he compared what he saw on the premises with the May 10, 1994 permit and Exhibit 4 and determined that the special use permit did not authorize the canopy as constructed. In particular, he referenced the structure's windows and heating systems as violative of the special use permit and the understanding the Board had reached with petitioners prior to the time of the permit's issuance. Tr.Notice of Violation Hearing at 8-9. His testimony in this regard was uncontradicted. The Board's decision therefore is supported not only by its own comparison of the structure authorized by Exhibit 4 with that actually built (the facts of which are uncontroverted) and the parties' earlier understanding, but also by the uncontroverted testimony of the Building Inspector. Thus the Board's finding that petitioners' structure violated the conditions of the May 10, 1994 special use permit is clearly supported by the competent evidence of record.
Moreover, this Court rejects petitioners' contention that the Board must state affirmatively in its decision every limitation it places upon a grant and that its failure to do so precludes the Building Inspector and the Board upon review from enforcing such limitations at a future time. Such a position is logically and practically untenable. The Board here properly limited its approval to the plan for installation of an awning presented to it by petitioners and their agreed understanding with petitioners about the proposed awning, thus eliminating petitioners' power to alter or extend the canopy from that shown to and approved by the Board. The Board's mandate in issuing the May 10, 1994 special use permit that the structure was to be constructed "per exhibit 4" was sufficient to notify petitioners of what they could and could not do. There was no misunderstanding. It is disingenuous for the petitioners to ask the Board for permission to construct a specific structure and then fault the Board for its failure to tell the petitioners what types of structures they could not build after petitioners decided unilaterally to construct a different structure than the one they sought and knew that they had permission to build. Here petitioners sought and received permission to install an awning over the patio as depicted in exhibit 4. They did not receive permission to construct anything else. For all of these reasons, the Board's January 10, 1995 decision upholding the Notice of Violation issued by the Town Building Inspector is affirmed and petitioners' appeal therefrom in WC 95-0053 is denied and dismissed.
On appeal in WC 95-0270, petitioners next contend that the Board erred in denying their requested curative special use permit. The South Kingstown Zoning Ordinance allows for property in C-3 zones, such as the zone in which the Mews Tavern is located, to be used as taverns and restaurants serving alcoholic beverages so long as a special use permit is granted. Bamber v.Zoning Board of Review, 591 A.2d 1220 (RI 1991) (stating that a special exception is a petition requesting relief expressly allowed by the applicable zoning ordinance.) The Rhode Island Supreme Court has held that where a second or subsequent special exception application seeks a use that is of the same character as the original approved use, but which would result in a substantial intensification of the prior use, the owner may not make such use of the property as of right, but rather must obtain a new special exception from the zoning board of review. Warnerv. Board of Review of City of Newport, 104 R.I. 207, 243 A.2d 92, 95 (1968). In the present matter, petitioners sought from the Board permission for intensification of a use previously authorized by way of a special exception. Petitioners' proposed expansion of its patio operation from an 87 person maximum capacity in the summer with a winter maximum capacity of 40 to an 87 person year round maximum capacity was certainly significant in and of itself. Tr. at 33. Petitioners also sought to construct a more substantial and more permanent nonseasonal patio enclosure. As a result, they could not construct and use the proposed unpermitted structure as a matter of right; indeed Board approval was required. This need for a new special use permit was specifically recognized by the Building Inspector and Karen Ellsworth, attorney for the Town, during the December 21, 1994 hearing on the petitioners' new request. See Tr. at 19 (citing South Kingstown Zoning Ordinance § 5-15).
To succeed with its curative special use permit request, petitioners had to prove to the Board that their proposal would not have a detrimental impact upon the public's health, safety, welfare or morals. Bamber, 591 A.2d at 1223-1224 (citing GaraRealty Inc. v. Zoning Board of Review, 523 A.2d 855 (RI 1987)). More specifically, petitioners had to satisfy the Board that the issuance of the permit would not result in "conditions inimical to the public health, safety, morals and welfare" and that the "use [would] not substantially and permanently injure the appropriate use of property in the surrounding" area. South Kingstown Zoning Ordinance § 510. In making its' determination, the Board could consider issues such as traffic flow, parking, trash, utilities, buffering, open spaces and the compatibility of the structure or its use. See South Kingstown Zoning Ordinance § 511.
Petitioners contend that the Board's denial of a "curative" special use permit was improper in that it was not based on legitimate reasons, and was not supported by substantial and competent evidence of record. The Board denied petitioners the requested curative special use permit stating:
 "First of all, that it violates the Doctrine of Administrative Finality because a temporary canopy with no walls or doors was approved, and he's (petitioner) requesting to create a permanent, enclosed structure.
 Also, because of the applicant's failure to follow stipulations; namely, leaving the patio open with no doors or walls; also, by not installing gutters; also, the conditional approval for a 1 AM closing time has not expired. We cannot see how the provisions Special Use Permit affects the surrounding neighborhood, and it shows that we don't have confidence in the Applicant to adhere to future stipulations.
 Thirdly, the Board has concern with the future road widening plans by DOT and how that would be contrary to public health, safety welfare, and that it would be an increased cost to the taxpayers if a permanent structure would have to be demolished versus a temporary structure which we have allowed to be there as of this point. And also basic concerns with safety of the road being to close too the building if that happens."
This Court finds that the Board's determination that granting the petitioners' request would be detrimental to the public safety, health and welfare is not supported by the competent evidence of record. The Board did not rely on any expert testimony to support its conclusions. There is no record evidence and instead mere speculation about the possibility of road expansion and the prospect of condemnation of petitioners' property. The record is also devoid of any testimony from real estate or appraisal experts as to the effect of the proposed structure upon the condemnation value of the land should expansion and condemnation occur. Similarly, the record contains no evidence from either traffic or structural engineers or anyone else which would support the conclusion that further enclosing a previously authorized patio either with or without road expansion would have a deleterious effect on public safety.
To the contrary, the only competent record evidence supports the proposition that the safety of patio patrons and others would not be compromised by further enclosure of the patio and that granting the petitioners' request would not have a detrimental impact on any public interest. The Board had before it a letter from and the testimony of Mr. Barnes stating that the structure and all its components would not be a structural hazard and that it would necessarily be in full compliance with fire codes. Tr. 7-8. Additionally, in his letter to the Board, Mr. Barnes stated that during the 1991 proceedings (during which the patio itself was originally approved), James Lawless, a registered engineer, testified that the railroad tie planter fence that was outlining the bottom portion of the patio was structurally sound and would protect customers seated in the patio area from any traffic traveling at the posted speed limit. Ms. Laurence, petitioners' counsel, noted for the record that the prior owner of the property was present and that according to him and Mr. Barnes during both their ownerships spanning more than 8 years nobody had ever driven into the building. Indeed, it could be argued that further enclosing the patio area could enhance its safety.
The Board also heard the testimony of Scott Halsberg, an expert in real estate and an abutter to the lot in question. Mr. Halsberg testified that the development of the lot had improved the area aesthetically and that the enclosure has probably reduced any noise problems that might have existed in the past. Mr. Halsberg also testified that he has not noticed any problems as far as ingress and egress from the Mews parking lot or with trash, signs or incompatibility of the building with its surroundings.
In a memorandum submitted by petitioners from the South Kingstown Police Department outlining all complaints filed with the department against the Mews, it is established that 5 founded complaints were filed from 10-93 to 11-94, but none of these complaints had anything to do with the patio area. No neighbors appeared at the hearing or wrote to complain about the requested patio expansion.
Lastly, and perhaps most significantly, the Board's assertion that the patio expansion posed a possible danger to patrons on the patio is not only unsupported by the evidence of the present proceeding, but it is also contradicted by the Board's earlier findings. See Wyss v. Zoning Board of Review, 99 R.I. 562, 565,209 A.2d 225 (1965)(holding that courts presume that official functions are properly performed, and that a Board making a decision has found the prerequisite facts to the decision and applied the proper legal standard); Audette v. Coletti,539 A.2d 520, 522 (R.I. 1988)(stating that in approving a prior special exception, a board finds that the public health and safety will not be implicated as long as any restrictions in the decision are complied with.) Thus in Wyss, the Supreme Court found that an earlier special use petition which had been granted as requested served as evidence in favor of a later petition which sought to expand that permit geographically. The structure proposed here by petitioners would fill the exact same dimensions as the already approved canopied patio. The only change sought by petitioners was to enclose the patio in a more substantial manner. Thus under the holding of Wyss, the record contains evidence that patrons sitting on the patio and other members of the public are not in danger from traffic, for such a factual finding was implicitly made by the Board in both 1991 and in 1994 when earlier special use permits for constructing and covering the patio were granted to petitioners.
Thus the Board acted without and against the record evidence when it found that petitioners' application adversely impacted public safety or that at some future date, when some indefinite and undefined possibility of road expansion and condemnation might occur, the patio might be a danger. Such speculation and conjecture absent record facts is legally insufficient to sustain a board's decision. Sartor v. Coastal Resources ManagementCouncil, 542 A.2d 1077 (R.I. 1988).
Additionally, the Board's other rational for denying the petition, namely that the petition cannot be granted because the Board cannot rely on petitioners to comply with conditions that could be imposed in connection with its issuance, is also improper. While the evidence of record does not support the need to impose any conditions upon the issuance of the permit, even if such conditions had been warranted by the facts, the Board's reasoning is legally flawed. In Wyss, our Supreme Court reversed a board's denial of a petition for a special exception based on the petitioners' prior failures to comply with limitations placed in previously granted special exceptions. The Court reached this decision because it held that the Board in Wyss, like South Kingstown's Board, had limited jurisdiction regarding applications for special exceptions. Boards are authorized only to determine whether the requested use would have a harmful effect upon the general welfare as set out in the applicable zoning statutes. Thus in the present controversy, the Board's jurisdiction only extends so far as to allow it to determine whether, if the use were permitted, it would adversely effect the general welfare. It is understandable that the Board was not trustful of petitioners generally or confident of their ability to build within the Board's requirements based on its view that they had built before in violation of the previously issued special use permit and the zoning laws and other Town ordinances. The Board, however, does not have jurisdiction to determine whether the petitioners are the type of persons to whom a permit should be granted. Petitioners historical mistakes must be addressed, if at all, by issuance of a Notice of Violation, as previously discussed, or in other forums. It is not the Board's role to punish in the context of reviewing a new application for a special use permit seeking intensification of a previously authorized use.
Lastly, the Board's assertion that the administrative finality doctrine prevents granting petitioners' request is also erroneous. When a board hears a request for relief, and denies it, the doctrine of administrative finality bars a second application for the same relief absent a showing of a material change in circumstances during the intervening time. Audette v.Coletti, 539 A.2d 520, 521-22 (R.I. 1988) (citing Marks v. ZoningBoard of Review, 98 R.I. 405, 203 A.2d 761 (1964)). This doctrine also prevents an applicant from evading previously imposed conditions without showing a change in circumstances. Id. (citing 5 Williams, American Land Planning Law § 146.03 (rev. 1985)). In the present situation, however, the Board did not impose "conditions" on the previous special use permits; instead it granted the requests. Currently petitioners do not seek to avoid prior conditions, but rather to expand the use which was the subject of prior approval. As such, Rhode Island Supreme Court precedent specifically requires petitioners to seek a new special use permit. Warner v. Board of Review of the City of Newport,104 R.I. 207, 243 A.2d 92 (1968). Thus the general policy of administrative finality does not bar consideration of the current petition. Lastly, petitioners are not barred from repetitioning the Board for a more substantial enclosure within one year of the May 10, 1994 decision because the one-year trial period applied not to the issuance of a permit to install an awning generally but only to the extension of patio hours which is not an issue in these appeals. See Notice of Decision dated May 10, 1994.
Accordingly, petitioners' appeal in WC 95-0207 is sustained and the Board's decision to deny the requested curative special use permit is reversed as it is not supported by substantial probative evidence of record and is otherwise contrary to law.
Conclusion
Counsel shall confer and agree upon an appropriate form of order and judgment, reflective of this Court's decision, and submit it to the Court forthwith for entry.